UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| KWAME DADZIE, | CASE NO. 3:21-CV-01989-JJH |
| Plaintiff, | JUDGE JEFFREY J. HELMICK |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Kwame Dadzie filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 21, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry of October 21, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

After Mr. Dadzie received an unfavorable decision in April 2017, he filed a new application for DIB in January 2019, alleging a disability onset date in August 2015. The unfavorable decision was subsequently affirmed by the District Court on March 4, 2019. (Tr. 410;

1

*See Dadzie v. Comm'r of Soc. Sec.*, 3:18 CV 518, 2019 WL 1021789 (N.D. Ohio Mar. 4, 2019). Mr. Dadzie's claims were denied initially and on reconsideration. (Tr. 279, 293). He then requested a hearing before an Administrative Law Judge. (Tr. 315-16). Mr. Dadzie (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on July 7, 2020. (Tr. 191-236). On September 30, 2020, the ALJ issued a written decision finding Mr. Dadzie not disabled. (Tr. 168-190). On August 27, 2021, the Appeals Council denied Mr. Dadzie's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7; *see* 20 C.F.R. §§ 404.955, 404.981). Mr. Dadzie timely filed this action on October 20, 2021. (ECF #1).

FACTUAL BACKGROUND

## I.   PERSONAL AND VOCATIONAL EVIDENCE

Mr. Dadzie was 36 years old at the time of his alleged onset date, and 40 years old at the time of the administrative hearing. (Tr. 265). Mr. Dadzie completed high school and earned a college degree. (Tr. 198). In the past, Mr. Dadzie has been employed as a production worker and (for a very brief time) a corrections officer. (Tr. 277).

## II.   RELEVANT MEDICAL EVIDENCE

Mr. Dadzie treats with mental health providers Tanvir Singh, M.D., and Patricia Paul, PCC-S, SW at Harbor. Throughout his course of treatment with Dr. Singh and Ms. Paul, Mr. Dadzie often presented as irritable and angry or with a flat, blunted affect. (Tr. 539-42, 557, 561, 563, 568-69, 620, 623, 606, 620, 623, 625, 635, 640, 642, 657, 667, 672, 690, 709, 729-30, 734, 891, 905, 918, 939, 947, 1023, 1054, 1077, 1081, 1127, 1139). At other times, Mr. Dadzie presented with a dysphoric mood and constricted affect. (Tr. 603, 629, 661, 725, 886, 901, 928, 955). He regularly endorsed symptoms of fluctuating anxiety, decreased motivation, decreased

2

concentration, mood swings, paranoia, and hearing voices. (Tr. 535, 546, 547, 561, 597, 599, 602, 607, 612, 628-29, 642, 647, 652, 660, 657, 672, 678, 689, 691, 723, 734, 884, 886, 891, 899, 901, 905, 918, 926, 939, 947, 955, 1023, 1048, 1054, 1068, 1077, 1081, 1103, 1127, 1129, 1133, 1141). Dr. Singh noted Mr. Dadzie's thought content was dominated by excessive worries and his attention was impaired. (Tr. 546, 557, 568-69).

Mr. Dadzie regularly reported isolating himself, engaging in destructive behavior during angry outbursts when he is at home, including punching walls and biting his own hands and wrists. (Tr. 542, 554, 561, 563, 576, 580, 582, 593, 595, 597, 599, 607, 625, 635, 642, 652, 657, 689, 691, 711, 734, 871, 892, 905, 939, 947, 1023, 1054, 1077, 1080, 1129, 1139, 1141). Ms. Paul observed such bite marks in June 2017 and July 2019. (Tr. 563, 947). Mr. Dadzie often expressed a belief that others were out to get him, he would be harassed and bullied in any workplace, and he endorsed hypervigilance and the feeling of being followed. (Tr. 561, 593, 597, 599, 612, 620, 623, 635, 640, 642, 657, 667, 672, 689, 729-30, 871, 891, 905, 939, 947, 1023, 1054, 1077, 1127, 1029, 1139, 1141). Around the beginning of 2019 and forward, Mr. Dadzie regularly complained of fatigue such that he struggled to stay alert and sustain a functional routine and short-term memory issues at times. (Tr. 884, 886, 899, 901, 918, 926, 955, 1048, 1068, 1080, 1103).

Mr. Dadzie has obstructive sleep apnea for which he uses a CPAP machine. (Tr. 1095). In May 2019, Mr. Dadzie had been using the CPAP machine for about two or three months. (*Id.*). At his appointment with Nader M. Zeitouni, M.D., Mr. Dadzie acknowledged wearing the CPAP machine for at least four hours a night and experienced improvement of his sleepiness and fatigue. (*Id.*). Mr. Dadzie reported he continued to take a one- to two-hour nap each day. (*Id.*). By

September 2019, Mr. Dadzie was wearing the CPAP machine for at least six hours a night. (Tr. 1093). He continued to endorse improvements in his level of sleepiness and fatigue, but continued to need a one- to two-hour nap every day. (*Id.*). In January 2020, Mr. Dadzie again endorsed improvements in his sleepiness and fatigue, and reported needing only "short naps" each day. (Tr. 1091).

On July 31, 2019, Mary Moeller, M.A., supervised by Bonnie Kauffmann, Ph.D., performed a psychological evaluation following a referral from Ms. Paul. (Tr. 1033). At the evaluation, Mr. Dadzie's mood was dysthymic and he appeared frustrated. (Tr. 1034). He did not appear distracted in any way or to be responding to hallucinations. (*Id.*).

Results of psychological testing (the Minnesota Multiphasic Personality Inventory, a/k/a MMPI), revealed Mr. Dadzie was likely exaggerating some of his reported symptoms, and the scales indicating overreporting were significantly elevated, "which suggests that Mr. Dadzie was endorsing symptoms that even those with genuine and serious psychosis do not typically endorse." (*Id.*). Further, "his report of symptoms, particularly his psychotic symptoms, was highly unusual compared to what others with psychosis generally tend to report." (*Id.*). Mr. Dadzie's profile on the Structured Inventory of Malingered Symptomatology (SIMS), a malingering scale, also indicated it was "likely he was overreporting on his current experiences of psychotic symptoms." (Tr. 1035). Scores exceeded the recommended cut-offs for malingering on all five subscales. (*Id.*). "Specifically, his profile had elevated scores on symptoms of Psychosis, Neurological Impairment, Amnestic Disorder, and Affective Disorders, meaning that he was likely exaggerating in all of the aforementioned categories." (*Id.*). Ms. Moeller and Dr. Kauffmann concluded:

> Mr. Dadzie's report of his current symptoms, report of his onset of symptoms, and scores on two separate measures of psychological symptoms all indicate that he is

4

overreporting in order to make himself appear sicker and lower functioning than he actually is. His report of his symptoms does not match what is normally reported by patients experiencing genuine psychosis. For example, it is highly unusual to have visual and auditory hallucinations that appear after a male patient is 30 and appear seven years apart from each other. Further, his report of visual hallucinations being in black-and-white is more consistent with alcohol or other substance abuse than with genuine psychosis. This does not mean that he is not genuinely experiencing any psychological symptoms; however, his interview and testing results are invalid due to overreporting and therefore cannot inform on a diagnosis. It is unclear at this time whether he is malingering or factitious, as his reported reason for attending the evaluation was to find an appropriate diagnosis.

(*Id.*). Mr. Dadzie refused services offered by Harbor, including the Day Treatment Program, Cognitive Enhancement group therapy, and the vocational services program. (Tr. 657, 672, 715, 734).

## III.  MEDICAL OPINION

On August 28, 2019, Irma Johnston, Psy.D., a state agency psychiatric consultant, considered Mr. Dadzie's report of worsening depression with suicidal thoughts, hearing voices, worse sleep apnea, and pain in his right shoulder, and adopted the ALJ's prior RFC decision, dated April 4, 2017. (Tr. 285, 290). As such, she concluded Mr. Dadzie is limited to simple, routine, and repetitive tasks in a non-fast paced work environment (not at a production rate pace such as assembly work; limited to being responsible for simple work-related decisions; can respond appropriately to occasional interaction with supervisors and coworkers, but cannot perform tandem work with coworkers and cannot have interaction with the general public; and is limited to routine job duties that remain static and are performed in a stable and predictable work setting with few changes. (*Id.*). None of Mr. Dadzie's treating providers offered an opinion.

5

## IV. ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Dadzie and VE Mark Pinti, presented during the hearing before the ALJ.

Mr. Dadzie lives alone and denies having any issues walking up and down the stairs. (Tr. 198). He has a driver's license but sometimes does not drive himself because he was in a car accident six months before the hearing. (Tr. 199). His brother drives him to the grocery store. (Tr. 219.). Mr. Dadzie is responsible for his personal hygiene. (Tr. 200). For fifteen years, Mr. Dadzie was a production worker and operated a forklift to unload products. (Tr. 207-08). In 2015, he was employed as a corrections officer for two weeks but left when he injured his shoulder on the job. (*Id.* at 208).

Mr. Dadzie alleges his medical conditions, including an injured right shoulder, kidney condition, sleep apnea, high blood pressure, depression, post-traumatic stress disorder (PTSD), and anxiety cause mental and physical limitations that preclude him from work. (Tr. 209-10). He testified these conditions cause fatigue and affect his performance and concentration on the job. (Tr. 210). His medications cause side effects, including nausea, fatigue, dry mouth, and headache. (Tr. 211). He can walk for fifteen minutes at a time before he gets fatigued and must sit down. (*Id.*). On a typical day, he sleeps, watches television, and goes to his mother's house, who is physically disabled, to wash dishes, cook for her, take out the trash, and take her to her doctor's appointments. (Tr. 212-13). He uses a lift to help his mother transfer in and out of her wheelchair. (Tr. 212). Mr. Dadzie denies seeing friends or family outside the home; endorses certain hobbies, including going to the movies and traveling (though he no longer travels due to his worsening

conditions); uses a social media account to interact with friends and family and to share pictures; and uses a smartphone to browse the internet. (Tr. 213-14, 218).

Mr. Dadzie uses a CPAP to address sleep apnea. (Tr. 216). The CPAP works but he still naps three to four hours a day, six days a week. (*Id.*). He sees a psychiatrist and a therapist once a month. (Tr. 217). Mr. Dadzie's fears, specifically of people coming after him and not having the desire to do anything, prevents him from leaving the house about three to four times a month. (Tr. 217-18). Mr. Dadzie experiences panic attacks one to two times a week that last about a half hour; driving can trigger his panic attacks, but he is able to handle being around other people in stores. (Tr. 219). He hears voices one to three times a week, which can also trigger a panic attack. (Tr. 220). He takes medicine to address the voices, but he still hears them. (*Id.*). Mr. Dadzie takes four different medications for high blood pressure, which cause side effects, including headaches, fatigue, profuse sweating, and frequent urination. (Tr. 221).

The VE then testified. The ALJ identified Mr. Dadzie's past relevant work as a machine feeder and a forklift operator. (Tr. 227-28). The ALJ asked if a hypothetical individual of Mr. Dadzie's age, education, and work history could perform past relevant work if subject to the following limitations: able to perform work at all exertional levels; never climb ladders, ropes, or scaffolds; never work around hazards such as unprotected heights or moving mechanical parts; occasionally operate a motor vehicle; occasionally work in conditions where there is concentrated dust, odors, fumes, and other pulmonary irritants, or where vibrations are present; frequently reach overhead with the right arm; simple, routine, and repetitive tasks, not at a production rate pace or assembly line work; being responsible for simple work-related decisions; occasional interaction with supervisors and coworkers, but no tandem work and no interaction with the

general public; routine job duties that remain static and are performed in a stable, predictable

work setting, where changes occur infrequently and are adequately explained. (Tr. 228-30). The VE

testified such an individual cannot perform Mr. Dadzie's past relevant work. (Tr. 230). The VE

identified other unskilled, medium exertion positions the individual could perform, including

warehouse worker (DOT 922.687-058), with approximately 200,000 jobs in the national economy;

industrial cleaner (DOT 381.687-018), with approximately 300,000 jobs in the national economy;

and floor waxer (DOT 381.687-034), with approximately 100,000 jobs in the national economy.

(*Id.*).

The VE also identified unskilled, light exertion positions the individual could perform,

including housekeeping cleaner (DOT 323.687-014), with approximately 200,000 jobs in the

national economy; folder (DOT 789.687-066), with approximately 50,000 jobs in the national

economy; and inspector (DOT 741.687-010), with approximately 100,000 jobs in the national

economy. (Tr. 230-32).

Additionally, the VE testified employers tolerate an employee being off task no more than

10% of the workday and absent no more than one day a month. (Tr. 232, 233). Employers would

not tolerate an employee who requires reinstruction on the performance of job duties after the

expiration of a probationary period, nor would they tolerate an employee's need to lie down

during regular work hours. (Tr. 233). Employees do not usually accommodate an employee's need

to address panic attacks occurring outside of regularly scheduled breaks. (Tr. 234).

## V. OTHER RELEVANT EVIDENCE

Mr. Dadzie completed an Adult Function Report, a Social Security Administration (SSA)

document that provides a claimant the opportunity to describe how his conditions affect or limit

his ability to function. (*See* Tr. 440-47). On a typical day, Mr. Dadzie wakes up, takes a shower, visits with his mother, watches television, and otherwise stays at home. (Tr. 441). He endorsed sleep disturbances due to sleep apnea, for which he uses a CPAP machine, and the side effects of his medications. Mr. Dadzie asserted he is able to drive, but only does so "part-time due to [his] illness/injury." (Tr. 442). He shops for clothing by computer and is able to pay bills, count change, and handle a savings account. (*Id.*). Mr. Dadzie denied needing reminders to take care of personal hygiene or to take medication. (Tr. 443). He disclaimed spending time with others and noted his estrangement from his family. (Tr. 446-47). He endorsed issues with memory, completing tasks, concentration, understanding, following instructions, using his hands, reaching, and getting along with others. (Tr. 447).

### THE ALJ'S DECISION

The ALJ's decision, dated September 30, 2020, included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2022.

2.  The claimant has not engaged in substantial gainful activity since April 5, 2017 (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: depression; anxiety; post-traumatic stress disorder (PTSD); and obstructive sleep apnea (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional

limitations: he can never climb ladders, ropes or scaffolds, or work around hazards such as unprotected heights, or around moving mechanical parts, and can occasionally operate a motor vehicle. He can occasionally work in conditions where there is concentrated dust odors, fumes, and other pulmonary irritants, or where vibrations are present. He can frequently reach overhead with the right dominant upper extremity. He is limited to simple, routine and repetitive tasks, in a non-fast paced work environment, not at a production rate pace (no assembly line work, for example). He is limited to being responsible for simple, work-related decisions, and he can respond appropriately to occasional interaction with supervisors and coworkers, but with no tandem work with coworkers and no interaction with the general public. Finally, he is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable predictable work setting. Any necessary changes need to occur infrequently, and be adequately and easily explained.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on July 20, 1979 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education. (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2015, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 174-84).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

12

5.     Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Mr. Dadzie alleges error with the RFC and argues the ALJ did not properly account for all the limitations resulting from his mental impairments, rendering the decision not supported by substantial evidence. (Pl.'s Br., ECF #10, PageID 1202). Specifically, Mr. Dadzie claims the ALJ did not account for his hearing voices, which cause panic attacks one to three times per week. (*Id.* at PageID 1202-03). In addition, Mr. Dadzie argues the ALJ did not consider how his obesity may affect his ability to maintain concentration, especially in light of his typically endorsed fatigue and the need for naps throughout the day. (*Id.* at PageID 1203-04). He maintains the ALJ could not have relied on the VE's testimony because the ALJ did not factor in Mr. Dadzie's need to lie down and take naps. (*Id.* at PageID 1217). Next, Mr. Dadzie argues "the ALJ failed to properly note and evaluate [Listing 12.06] in accordance with evidence in this case and listing requirements," asserting that he also meets Listing 12.15. (*Id.* at PageID 1206). Mr. Dadzie also claims that

13

evidence he submitted to the Appeals Council after the ALJ issued her unfavorable decision supports remand pursuant to Sentence Six. (*Id.* at PageID 1206-07).

In response, the Commissioner asserts Mr. Dadzie has not shown Listing-level severity of his mental impairments. (Comm'r's Br., ECF #12, PageID 1249). As to his RFC-related arguments, the Commissioner argues the ALJ appropriately evaluated Mr. Dadzie's residual functional capacity and the assessment is supported by substantial evidence. (*Id.* at PageID 1251). Finally, the Commissioner argues against a remand under Sentence Six. (*Id.* at PageID 1257).

**A.      The ALJ appropriately concluded Mr. Dadzie does not meet Listings 12.04, 12.06 and 12.15.**

When considering whether a claimant's impairment "meets or equals" a listed impairment, the Sixth Circuit requires an ALJ "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at step three was supported by substantial evidence." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).

Here, the ALJ considered Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma and stressor-related disorders), each of which contain three paragraphs, designated A, B, and C. *See* 20 CFR Part 404, Subpart P, Appendix 1. Paragraphs B and C are identical for each listing. *See id.* The ALJ determined the severity of Mr. Dadzie's mental impairments, considered singly and in combination, do not meet or medically equally the criteria of those listings. (Tr. 176). The ALJ did not specifically address the criteria of Paragraph A, which state the medical criteria that must be present in the medical evidence, *see* 20 CFR Part 404, Subpart P, Appendix 1, but determined Mr. Dadzie's mental impairments did not satisfy the criteria in paragraph B or C. (Tr. 176-77).

14

The paragraph B criteria represent the areas of mental functioning a person uses in a work setting, and how mental impairments affect the ability to function independently, appropriately, effectively, and on a sustained basis in each area. 20 CFR Part 404, Subpart P, Appendix 1, 12.00A. To satisfy the paragraph B criteria, the mental disorder must result in an "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning: the ability to understand, remember, or apply information; interacting with others; concentration, persistence or maintenance of pace; and the ability to adapt or manage oneself. *Id.*

The paragraph C criteria are used to evaluate "serious and persistent mental disorders." *Id.* To satisfy the paragraph C criteria, a claimant must establish there is a medically documented history of the existence of the disorder over a period of at least two years, and must show evidence that the disorder satisfies C1 and C2. 20 CFR Part 404, Subpart P, Appendix 1, 12.00G. The criterion in C1 is satisfied when the evidence shows the claimant relies, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial supports, or a highly structured setting, to diminish the symptoms and signs of the disorder. *Id.* The criterion in C2 is satisfied when evidence shows, despite the claimant's diminished symptoms and signs, the claimant has reached only marginal adjustment, meaning the claimant has only minimal capacity to adapt to changes in his environment or to the demands not already a part of the claimant's daily life. *Id.*

Here, the ALJ reasonably determined Mr. Dadzie is moderately limited in all four areas of mental functioning. (Tr. 176-77). For each area of mental functioning, the ALJ stated the evidence on which she relied to support her conclusions. (*Id.*). Mr. Dadzie concludes he is extremely limited in at least three areas of mental functioning and points to evidence he argues supports his conclusion, including hallucinations, panic attacks, and concentration issues. (*See* Pl.'s Br., ECF

#10, PageID 1202-03, 1206). Read as a whole, the ALJ's written decision reflects that she considered all this evidence. (Tr. 179-82). Mr. Dadzie's argument is a request that the Court re-weigh the evidence and come to a different conclusion. This exceeds the bounds of the Court's standard of review. *See Brainard*, 889 F.2d at 681 (noting that the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence).

As to the paragraph C criteria, the ALJ concluded the record was devoid of evidence to establish Mr. Dadzie had only achieved marginal adjustment. (Tr. 177). She noted that Mr. Dadzie had never received inpatient psychiatric treatment related to his mental health impairments and took into account the results of tests conducted during a psychological evaluation that indicated Mr. Dadzie was likely exaggerating and overreporting his experiences of psychotic symptoms. (Tr. 177). Mr. Dadzie asserts the ALJ wrongly relied on those test results, but the record is devoid of evidence to indicate there is any reason to doubt the validity of those tests and Mr. Dadzie does not argue otherwise. (*See* ECF #10, PageID 1204; ECF #14, PageID 1269-70).

I find no basis to overturn the ALJ's analysis of why Mr. Dadzie's disability did not meet the requirements of Listings 12.04, 12.06 and 12.15, and therefore decline to recommend remand on this basis.

**B.    The ALJ's RFC assessment is supported by substantial evidence.**

It is well-established that the ALJ assesses and determines a claimant's residual functional capacity. See 20 C.F.R. §§ 404.1545(a) ("We will assess your residual functional capacity based on all the relevant evidence in your case record"); 404.1546(c) ("the administrative law judge ... is responsible for assessing your residual functional capacity"); and 404.1527(d)(2) (the final responsibility for deciding residual functional capacity is reserved to the Commissioner); *see also*

*Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) ("the ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an 'assessment of [her] residual functional capacity'"). The ALJ must form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work, once the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020).

In addition, when evaluating a claimant's RFC, the ALJ assesses the "effect obesity has upon the [claimant's] ability to perform movement routine movement and necessary physical activity within the work environment." SSR 19-2p, *4. Relevantly, SSR 19-2p, which offers guidance on how obesity is evaluated, also states: "In cases involving obesity, fatigue may affect the person's physical and mental ability to sustain work activity. This may be particularly true in cases involving obesity and sleep apnea." *Id.*

Mr. Dadzie asserts the ALJ did not properly account for Mr. Dadzie hearing voices, which causes him to experience panic attacks one to three times a week lasting a half hour. (ECF #10, PageID 1203). Mr. Dadzie's hallucinations and panic attacks are symptoms he often reported to his treatment providers. He claims this could potentially interfere with pace and persistence and staying on task. *Id.* The ALJ, however, is only required to include in the RFC those limitations she

finds credible and supported by the record. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The ALJ is not required to accept the claimant's subjective complaints and may discount the claimant's subjective testimony when the ALJ finds it inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76.

Here, the ALJ determined Mr. Dadzie's statements, particularly those regarding auditory hallucinations, were not supported by the record evidence. (Tr. 181). The ALJ asserted Mr. Dadzie's symptoms were not as severe as alleged and cited the test results indicating Mr. Dadzie was likely exaggerating reported symptoms and overreporting his current experiences with psychotic symptoms. (*Id.*). An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from them. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Moreover, the ALJ properly evaluated the effect obesity had on Mr. Dadzie's mental functioning. The ALJ acknowledged Mr. Dadzie's obesity, moderate obstructive sleep apnea, and use of a CPAP machine. (Tr. 180). He noted that after six months of using the CPAP machine, Mr. Dadzie reported that his tiredness and fatigue had improved. (Tr. 181). The ALJ ultimately found Mr. Dadzie's testimony about taking naps three to four hours a day six days a week was inconsistent with the statements of improvement he made to his providers and findings that he

was generally alert and oriented, suggesting that his symptoms were not as severe as alleged. (Tr. 181-82).

The ALJ appropriately considered all relevant medical and other evidence in the assessment of Mr. Dadzie's RFC, included restrictions that addressed his limitations, and cited substantial evidence supporting the assessment. (Tr. 180-83). Mr. Dadzie has not shown the ALJ erred in her assessment of his residual functional capacity. Because the ALJ's hypothetical question to the VE accurately reflected Mr. Dadzie's limitations, the ALJ was entitled to rely on the VE's testimony that Mr. Dadzie can perform other work. *See Varley v. Sec. of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (noting that substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a "hypothetical" question, but only "if the question accurately portrays [plaintiff's] individual physical and mental impairments") (internal citations omitted).

In light of the foregoing, I find no basis to disturb the ALJ's assessment of Mr. Dadzie's RFC.

**C. Mr. Dadzie is not entitled to remand under Sentence Six.**

Under Sentence Six of 42 U.S.C. § 405(g), the District Court does not affirm, modify, or reverse the Commissioner's decision; it does not rule in any way as to the correctness of the administrative determination. *Melkonyan v. Sullivan*, 501 U.S. 89 (1991); *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 734 (N.D. Ohio 2005) ("'Sentence six' of 42 U.S.C. § 405(g) permits a reviewing court to remand, without ruling on the merits."). If a Sentence Six remand is ordered, the District Court retains jurisdiction while the matter is remanded to the Social Security Administration for further proceedings; it is not a final judgment that can be appealed. *Melkonyan*,

501 U.S. 89; *Cross*, 373 F.Supp.2d 724; *Wasik v. Comm'r of Soc. Sec.*, No. 09–14933, 2011 WL 740686 (E.D. Mich. Feb. 24, 2011). A claimant must establish two prerequisites before a district court may order a Sentence Six remand. *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 484 (6th Cir. 2001). A claimant must show: (i) the evidence at issue is both "new" and "material"; and (ii) there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). The party seeking remand bears the burden of meeting these two requirements. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

The Sixth Circuit has explained that "evidence is new only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Foster*, 279 F.3d at 357. Such evidence, in turn, is deemed "material" if "there is a probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with new evidence." *Id.* However, "evidence that demonstrates a [claimant's] deteriorating condition is not relevant to a remand determination under Sentence Six." *Wasik*, 2011 WL 740686 at *6. Moreover, "[r]ecords that show a lack of improvement, which were created after the ALJ's disability determination, cannot be used to show disability existed at the time of the disability determination." *Id.* Evidence of the aggravation or deterioration of a condition is not relevant because "it does not demonstrate the point in time that the disability itself began." *Guy v. Comm'r of Soc. Sec.*, No. 11-12828, 2013 WL 1148413, *11 (E.D. Mich. Feb. 19, 2013) (quotation omitted).

Mr. Dadzie provided records post-dating the ALJ's written decision that reflected he sought voluntary inpatient psychiatric treatment at Arrowhead Behavioral Health on October 13, 2020, and Mercy St. Charles Medical Center on June 19, 2021. (*See* Tr. 8-133, 139-67). During an intake

assessment at Arrowhead, Mr. Dadzie reported worsening symptoms of depression over the past few months and continued hallucinations two to three times a week. (Tr. 167). According to records from St. Charles, Mr. Dadzie presented to the emergency department with reported suicidal ideation. (Tr. 9). He reported that recent medication changes could have caused his ideation to increase, and endorsed worsening depression for about one year. (Tr. 15

Because the records demonstrate a subsequent deterioration and do not provide evidence establishing the point in time the disability itself began, Mr. Dadzie has not shown that the new evidence is material to his condition at the time the ALJ issued her written decision. Therefore, I recommend the Court conclude that Mr. Dadzie is not entitled to remand under Sentence Six.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying disability insurance benefits supported by substantial evidence and recommend the District Court **AFFIRM** the Commissioner's decision.

Dated: September 30, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).